# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: April 17, 2025

```
* * * * * * * * * * * * * *
MAUREEN NELSON,               *    No. 19-438V
                              *
            Petitioner,       *    Special Master Young
                              *
v.                            *
                              *
SECRETARY OF HEALTH           *
AND HUMAN SERVICES,           *
                              *
            Respondent.       *
* * * * * * * * * * * * * *
```

*Robert Joel Krakow,* Law Office of Robert J. Krakow, P.C., New York, NY, for Petitioner.
*Colleen Clemons Hartley,* U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON DAMAGES**[1]

On March 25, 2019, Maureen Nelson ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Program" or "Program"). 42 U.S.C. § 300aa-10 to 34 (2018). Petitioner alleged that the influenza ("flu") vaccine she received on December 22, 2016, caused her to develop Guillain-Barré Syndrome ("GBS"), a Table injury. Am. Pet., ECF No. 11. On April 6, 2020, Respondent filed his report pursuant to Vaccine Rule 4(c) and "recommend[ed] that compensation be awarded." Resp't's Report at 1, ECF No. 27. Respondent specified that "[t]he scope of damages to be awarded is limited to [P]etitioner's GBS and its related sequelae only." *Id.* at 5. On April 7, 2020, Chief Special Master Brian H. Corcoran issued a Ruling consistent with Respondent's concession that Petitioner was entitled to compensation. ECF No. 28. The case proceeded to damages, but the parties remain unable to agree on an amount, which consists of pain and suffering and a life care plan.[2]

For the reasons discussed below, and after considering the entire record and argument from the parties, I find that Petitioner is entitled to a total pain and suffering award of **$190,000.00**, compensation to satisfy her Medicaid Lien, and an amount sufficient to fund a Life Care Plan.

---

[1] This Decision will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted Decision. If, upon review, I agree that the identified material fits within the requirements of that provision, such material will be deleted from public access.

[2] Originally, the parties also included damages for a Medicaid Lien, but this was resolved by the parties through an agreed upon amount. Joint Status Report, ECF No. 125.

## I. Procedural History

On March 25, 2019, Petitioner filed her petition, medical records, and a declaration. Pet., ECF No. 1; Pet'r's Exs. 1–19, ECF Nos. 4-6. This case was assigned to the Special Processing Unit ("SPU") on March 26, 2019. ECF No. 7. On May 20, 2019, Petitioner amended her petition. Am. Pet. Petitioner filed additional medical records and her statement of completion on July 1, 2019. Pet'r's Ex. 20, ECF No. 15; ECF No. 17.

Respondent filed his report on April 6, 2020. Resp't's Report. In his Rule 4(c) report, Respondent conceded that Petitioner was entitled to compensation, and the Chief Special Master consequently issued a Ruling on Entitlement in favor of Petitioner. *Id.* at 1; ECF No. 28. On April 10, 2020, the Chief Special Master issued an order initiating the damages phase. ECF No. 29. Petitioner submitted a status report requesting permission from the Court to retain a life care planner on June 22, 2020. Status Report, ECF No. 33.

Over the next few months, Petitioner filed additional medical records. Pet'r's Exs. 21–22, ECF No. 35; Pet'r's Exs. 23–24, ECF Nos. 41-42; Pet'r's Ex. 25, ECF No. 48-1. A telephonic status conference was held on May 5, 2021, to discuss Petitioner's request for a life care planner, and two days later, the Court entered an order authorizing the retention of a life care planner. Order, ECF No. 52 at 1. Petitioner continued to file updated medical records. Pet'r's Ex. 27, ECF No. 53; Pet'r's Ex. 28, ECF No. 62; Pet'r's Ex. 29, ECF No. 64; Pet'r's Ex. 30, ECF No. 68; Pet'r's Ex. 31, ECF No. 70; Pet'r's Ex. 32, ECF No. 79.

On October 24, 2022, Petitioner filed a status report informing the Court that a damages demand was sent to Respondent. Status Report, ECF No. 85. On January 13, 2023, Petitioner submitted a status report informing the Court that the parties could not come to a settlement agreement on the issue of damages and requested a briefing schedule. Status Report, ECF No. 88. On April 17, 2023, Petitioner filed a declaration by her brother, Brian Derham. Pet'r's Ex. 33, ECF No. 93.

Petitioner filed her memorandum on the issue of damages along with her life care plan by Valerie V. Parisi RN, CRRN, CLCP, on April 18, 2023. Pet'r's Mot., ECF No. 95. Thereafter, Petitioner continued to file medical records. Pet'r's Exs. 38–39, ECF Nos. 96-97; Pet'r's Ex. 40, ECF No. 101; Pet'r's Ex. 41, ECF No. 105; Pet'r's Ex. 42, ECF No. 108; Pet'r's Ex. 43, ECF No. 111. Respondent filed his response along with a life care plan by Laura F. Fox, MSN, BSN, RN, CLCP, on June 20, 2023. Resp't's Response, ECF No. 114; Resp't's Exs. A–C, ECF No. 113. Petitioner filed her reply on July 20, 2023. Pet'r's Reply, ECF No. 116. On August 11, 2023, the case was reassigned to my Chambers. ECF No. 120. Petitioner filed additional medical records on September 26, 2023. Pet'r's Ex. 44, ECF No. 121.

On November 1, 2023, the parties filed a joint status report informing the Court that the Medicaid lien component of Petitioner's damages claim had been resolved. Joint Status Report, ECF No. 125. Since, Petitioner continued to file medical records. Pet'r's Ex. 45, ECF No. 126; Pet'r's Ex. 46, ECF No. 128; Pet'r's Ex. 47, ECF No. 132; Pet'r's Ex. 48, ECF No. 133. Respondent filed an updated life care plan on March 18, 2025. Resp't's Ex. D, ECF No. 135. On

April 4, 2025, Petitioner filed a supplemental brief on damages. Pet'r's Supp. Br., ECF No. 136. Respondent subsequently filed a supplemental letter by Ms. Fox on April 10, 2025. Resp't's Ex. E, ECF No. 137. This matter is now ripe for adjudication on the issue of damages.

## II.     Medical History

Petitioner was 63 years old when she received the flu vaccine at a CVS pharmacy on December 22, 2016. Pet'r's Ex. 1 at 2, ECF No. 4-1. Her medical history was significant for hypertension, high cholesterol, anxiety, depression, and substance abuse. Pet'r's Ex. 3 at 4, 15, ECF No. 4-3; Pet'r's Ex. 5 at 10, ECF No. 4-5; Pet'r's Ex. 8 at 7–8, ECF No. 4-8; Pet'r's Ex. 17, ECF No. 6-6; Pet'r's Ex. 18, ECF No. 6-7.

On January 8, 2017, seventeen days after vaccination, Petitioner presented to the emergency room ("ER") at St. Joseph Hospital with "bilateral leg weakness that [had] progressively worsened over the past week with associated paresthesia." Pet'r's Ex. 7 at 9, ECF No. 4-7. Petitioner reported being unable to go up and down stairs in her home without falling and admitted that she had been sick the past couple of months with a "cold." *Id*. On physical examination, Petitioner demonstrated a slight ataxia with ambulation, but deep tendon reflexes were not documented. *Id*. at 10. Additionally, Petitioner noted she had "poor coordination and [was unable] to control her lower leg movements." *Id*. at 12. Encounter notes stated that Petitioner had a history of alcohol abuse. *Id*. at 12. Petitioner underwent a lumbar puncture, CT scan, and IVIG was started for suspected GBS. *Id*. Her CT scan was normal, and the cerebrospinal fluid ("CSF") extracted by the lumbar puncture revealed elevated proteins. *Id*. at 16–21. She was admitted to the hospital and prescribed thiamine for a history of alcohol abuse. *Id*. at 20.

Petitioner underwent a neurology consultation with Birendra K. Trivedi M.D., on January 10, 2017. *Id.* at 50. Petitioner reported having an upper respiratory tract infection in October of 2017, but it was "cleared by the end of November." *Id.* She then began to develop lower extremity paresthesia on January 2, 2017. *Id.* at 50–51. Dr. Trivedi noted that Petitioner's CSF results were suggestive of GBS. *Id.* at 51. He recommended physical therapy for Petitioner and IVIG for five days. *Id.* The same day, Petitioner was assessed by physical therapy at St. Joseph Hospital. *Id.* at 52. Physical therapy assessment notes reported that Petitioner had "[d]ecreased transfers, [d]ecreased ambulation, [d]ecreased stair mobility, [d]ecreased endurance, [and] [d]ecreased strength," but her prognosis was good with continued physical therapy. *Id.* at 53. Petitioner had a neurology follow up on January 11, 2017, with Dr. Trivedi. *Id.* at 77. Dr. Trivedi noted Petitioner's slight improvement of leg weakness on IVIG and for her to continue IVIG along with physical therapy. *Id.* at 81.

On January 12, 2017, Petitioner reported to physical therapy, where her physical therapist noted that she was unsteady and at a high risk for falls. *Id.* at 83. Petitioner's treatment plan called for continued physical therapy. *Id.* at 84. On the same day, Petitioner had a neurology follow-up with Dr. Trivedi. *Id.* at 87. On examination, Dr. Trivedi reported wide-based gait and deep tendon reflexes. *Id.* at 88. In a January 13, 2017, follow-up note, Dr. Trivedi reported that Petitioner was completing her five-day course of IVIG and would require rehabilitation. *Id.* at 117.

Petitioner remained at St. Joseph Hospital until January 18, 2017, then she was transferred to Nassau Extended Care Facility ("NECF") for rehabilitation. Pet'r's Ex. 4 at 2, ECF No. 4-4.

3

At the time of transfer, she reported general pain and numbness. *Id*. at 19. While at NECF, her entry notes showed improvement despite dealing with weakness, depression, and anxiety. *Id.* at 12–20. A March 1, 2017, NECF entry note stated that Petitioner smelled like alcohol, so an assessment was conducted, and "slurred speech and jittery movement" were noted. *Id.* at 5. The next day, March 2, 2017, Petitioner was transferred from NECF to Mercy Medical Center for "evaluation of alcohol withdrawal symptoms." *Id.* At discharge from NECF, her diagnoses were alcoholism, lumbar radiculopathy, and GBS. *Id.* at 2.

Petitioner presented to Mercy Medical Center for alcohol intoxication, a fall, and back pain on March 2, 2017. Pet'r's Ex. 6, ECF No. 4-6. Encounter notes from March 2, 2017, reported that Petitioner fell while walking the day before, and her back was the point of impact with pain occurring in her back and right shoulder. *Id.* at 6. Petitioner remained at Mercy Medical Center until March 10, 2017, and was transferred to Rockaway Care Center ("RCC"), a long-term residential care facility. *Id.* 86.

Petitioner would remain at RCC for over two years. A March 11, 2017, psychiatric consultation noted that Petitioner had "a history of [GBS] with neuropathy although [neuropathy] may be secondary to alcoholism." Pet'r's Ex. 2 at 292, ECF No. 4-2. A March 26, 2017, psychiatric consultation noted major depressive disorder, alcohol dependence, and GBS. *Id.* at 303. Petitioner was disciplined for having alcohol in the RCC facility on April 5, 2017, and was later noted as a "'problem' resident." *Id.* at 306, 313. By June 2017, approximately five months after her GBS diagnosis, Petitioner continued to ambulate with a walker throughout the facility and took Percocet for pain. Pet'r's Ex. 9 at 216, 313, ECF No. 4-9. GBS, chronic pain, and depression were present throughout her 2018 RCC progress notes. *See* Pet'r's Ex. 2 at 873–75, 878, 888.

On August 20, 2018, Petitioner was seen by a neurologist, Sergey Zhivotenko M.D., who diagnosed Petitioner with peripheral neuropathy and recommended physical therapy. Pet'r's Ex. 13 at 2; ECF No. 6-2. Dr. Zhivotenko also recommended Petitioner to stop "alcohol abuse" and for her to taper off Percocet for pain and replace the medication with Tylenol 650mg. *Id.* at 2–3. A nerve condition study and electromyography ("EMG") were conducted the same day, and the EMG's findings were "consistent with the sensori-motor polyneuropathy with axonal loss." *Id.* at 7. An October 23, 2018, progress note indicated that Petitioner had seen another neurologist for a second opinion who felt that Petitioner exhibited "drug seeking behavior." Pet'r's Ex. 19 at 946, ECF No. 6-9. Petitioner signed herself out of RCC against medical advice on August 11, 2019. Pet'r's Ex. 21 at 87, ECF No. 35-1. She was provided with her walker and medication. *Id*.

On August 23, 2019, Petitioner presented to the Good Samaritan ER seeking prescriptions for her medication. Pet'r's Ex. 25 at 407, ECF No. 48-1. Petitioner stated that the reason for her visit was due to "severe nerve damage from [GBS]" and reported that the pain was worse. *Id.* Petitioner complained of dizziness and lightheadedness. *Id.* She stated that she felt like she was going to faint. *Id.* Encounter notes showed that Petitioner reported having "nerve pain to hands feet and back," and a "burning pain down both arms." *Id.* at 277–88. She was discharged the same day. *Id.* at 281.

Over one year later, on August 27, 2020, Petitioner saw neurologist Hos Loftus M.D. with complaints of weakness, gait disturbance, foot pain, frequent falls, and difficulty with self-care

4

activities. Pet'r's Ex. 24 at 7, ECF No. 42-1. Petitioner was walking with a walker during this visit. *Id.* at 11. Petitioner was diagnosed with gait impairment, neuropathy, and foot pain. *Id.* Dr. Loftus ordered EMG studies, recommended physical therapy, and prescribed "pain management for dysesthesia/tenderness in feet." *Id.*

A care assessment plan was completed on August 31, 2020, by Catholic Home Care, Catholic Health Services, which noted Petitioner's neuropathy diagnosis and gait abnormality. Pet'r's Ex. 29 at 16, 17, ECF No. 64-1. Petitioner required physical therapy to address her "gait/balance" and "severe impairment gait." *Id.* at 17. From September 2020 to October 2020, Petitioner received services from Catholic Home Health. Pet'r's Ex. 28, ECF No. 62-1. Clinical notes recorded Petitioner being short of breath after walking more than 20 feet and at an elevated risk for falls. *Id.* at 32. Petitioner's unsteady gait necessitated support for outdoor ambulation and required gait training, lower extremity strengthening, and standing balance training, among other deficits. *Id.* at 13, 32. After Petitioner completed three home physical therapy sessions, she declined further sessions because she was "doing well." *Id.* at 32.

On October 17, 2020, Petitioner presented to the Good Samaritan ER for treatment of a head wound. Pet'r's Ex. 25 at 316. She reported, "a mechanical fall due to the weakness in her legs[, and] she tripped and fell on a hardwood floor, hitting the top of her head." *Id.* Petitioner claimed that she fell "a lot" due to her GBS, which caused her to be "unsteady on her feet."[3] *Id.* at 315.

Petitioner presented to Agha Raza, M.D., a neurologist, on October 27, 2021. Pet'r's Ex. 29 at 7–11. It was revealed that Petitioner never completed the EMG that was ordered by Dr. Loftus in 2020. *Id.* at 7. On physical examination, Petitioner exhibited ongoing gait issues and tremors in the upper extremity. *Id.* Dr. Raza also noted "ongoing neuropathic pain." *Id.* at 10.

An EMG on Petitioner's lower extremities was conducted on December 27, 2021, which revealed moderate-to-severe axonal large fiber polyneuropathy of the lower extremities. Pet'r's Ex. 31 at 10, ECF No. 70-1.

On April 24, 2023, Petitioner presented to Catholic Health Good Samaritan University Hospital complaining of left-sided rib pain after a fall the day before. Pet'r's Ex. 40 at 13; ECF No. 101. She explained that she was walking, and her legs "gave out." *Id.* Petitioner reported a history of GBS and chronic weakness in her lower extremities. *Id.* Petitioner was discharged from the hospital with a rib fracture diagnosis. *Id.* at 81.

No further medical records have been filed.

### III.  Petitioner's Statements

#### a. Affidavit

Petitioner filed a declaration with her first batch of medical records on March 25,

---

[3] A fall risk assessment performed at Good Samaritan found a score of "60." Pet'r's Ex. 25 at 335. Petitioner's score fell within the High-Risk category, which is a score greater than 45. *Id.* This requires high risk interventions, including "[c]lose supervision/assistance with ambulation." *Id.*

2019. Pet'r's Ex. 11, ECF No. 5. Prior to her flu vaccination on December 22, 2016, she lived an "active and healthy life, living in the basement of [her] brother Brian Derham's and his family's home in Wantagh, New York." *Id.* at ¶ 4. During her stay, she helped the family with household chores and frequently went in and out of the home during the day. *Id.* She stated that she did "a lot of cleaning, laundry, cooking, food shopping, and yardwork [etc]." *Id.* Since Petitioner could not drive, she walked everywhere, which included "the store, doctor's visits, and the pharmacy." *Id.* She further asserted that she was "walking up and down the stairs many times a day, with no problems." *Id.*

Petitioner received her flu vaccine on December 22, 2016. *Id.* at ¶ 2. She "continued to feel well at the end of December and after the New Year but around the day of [her] birthday, January 4,[ 2017, she] noticed [that her] shoes started to feel too large." *Id.* at ¶ 5. Petitioner described feeling "clumsy while [navigating] puddles in the street, curbs, and [stairs.]" *Id.* She further recalled not being able to "sit up in bed" and that her "hands weren't cooperating with what [she] wanted them to do." *Id.* She subsequently "fell down the stairs[,]" which is when she knew she had to go to the ER. *Id.*

Petitioner presented to the nearest hospital, St. Joseph's in Bethpage, New York, on the late afternoon or early evening of January 8, 2017. *Id.* at ¶ 6. While at St. Joseph's, Petitioner underwent medical tests, including a lumbar puncture. *Id.* Petitioner reported having "poor reflexes" and "becoming paralyzed[,]" which made her feel "very afraid." *Id* At the hospital, Petitioner was diagnosed with GBS. *Id.* She then recalled that "[a]fter about two weeks, some of the time spent in the ICU, [she] snuck out of bed and tried to go to the bathroom and fell straight back on [her] head." *Id.*

While at the hospital, Petitioner was informed that she would have to go to a rehabilitation facility. *Id.* at ¶ 7. She recalled feeling "pathetic" and described losing "many abilities, such as turning over while in bed, brushing [her] hair, moving [her] eyes, chewing, going to the bathroom, washing up, and showering." *Id.* Petitioner was "humiliated by [her] condition, exhausted all the time, confused and scared[.]" *Id.*

During her time at NECF, Petitioner engaged in physical therapy, during which she remarked that "the pain truly began." *Id.* at ¶ 8. During this time, her "back wouldn't hold [her] up" and she described it as being "bent in half and broken." *Id.* Petitioner "lost a lot of weight and was weak as a newborn kitten" during this time. *Id.* Petitioner worked hard at rehab. *Id.* However, she was "frightened of falling at any time," which happened quite often, but she kept trying to walk, determined not to "live in a [wheelchair.]" *Id.*

Currently, Petitioner uses a walker to exercise in her room two to three times a day. *Id.* at ¶ 9. She has "no balance" and has to "hold on to things when [she] walk[s]." *Id.* Petitioner continues to experience "neuropathy, back pain and spasm." *Id.* GBS is Petitioner's new normal, and she can no longer go dancing on the weekends, carry heavy grocery bags, or go to her brother's house because she is unable to go "up and down the steep flight of stairs." *Id.* at ¶ 10. Petitioner's life has changed, and she will "always be in pain, need a walker[,] and worry about how [she will] support [herself]." *Id.*

b. **Declaration**

Petitioner filed a declaration authored by her brother, Brian Derham. Pet'r's Ex. 33, ECF No. 93. In 2016, Petitioner was residing with her brother at his home in Wantagh, New York, for a few months. *Id.* at ¶ 3. According to Mr. Derham, Petitioner "helped with chores, cooking[,] and on occasion with shopping." *Id.* Mr. Derham prepared an area in his basement for Petitioner to stay. *Id.* at ¶ 4. During the day, Petitioner was "up and down the stairs many times" and was "continually active and self-sufficient." *Id.* Since Petitioner did not drive, Mr. Derham asserted that she usually walked everywhere and would walk more than a mile to the local store. *Id.* at ¶ 5. Even when Petitioner was offered a car ride, she would decline. *Id.*

In early 2017, Mr. Derham recounted how Petitioner complained that her feet "felt like they weighed 40 pounds," and she had "trouble going up and down the stairs to her room." *Id.* at ¶ 6. A day or two later, Petitioner fell while going down the stairs to the basement of Mr. Derham's home. *Id.* Mr. Derham took Petitioner to the ER at St. Joseph's, the local hospital in Bethpage, New York. *Id.* A few days later, Petitioner informed Mr. Derham that she had a "form of paralysis called GBS." *Id.* at ¶ 7. Mr. Derham stated that Petitioner "has never been the same as she was in 2016 when she was living in [his] house and before." *Id.* at ¶ 8.

While at RCC, Petitioner complained to her brother that "the staff at Rockaway was doing nothing for her condition." *Id.* at ¶ 9. During visits, Mr. Derham noted that the conditions at RCC were "appalling" and described this as a "very sad time." *Id.* According to Mr. Derham, "[a]fter a long time," Petitioner left RCC and obtained an apartment. *Id.* at ¶ 10. Petitioner told Mr. Derham that she experienced "great difficulty" while walking and she suffered from frequent falls despite being careful, with at least one fall requiring an emergency room visit for her injuries. *Id.* at ¶ 11.

Mr. Derham asserted that Petitioner "is nothing like the big sister [he] knew all [his] life through early January 2017." *Id.* at ¶ 12. After her GBS diagnosis, "everything changed." *Id.* Now, Petitioner has "difficulty walking and doing simple tasks[,]" and "has gone from being independent and self-reliant for basic things like shopping to being dependent on others for everyday activities." *Id.*

### IV.  Life Care Plans

Petitioner submitted a life care plan developed by Valerie V. Parisi, RN, CRRN, CLCP. Pet'r's Ex. 34, ECF No. 95-1. Petitioner was 69 years of age at the time Ms. Parisi developed her plan in 2022, and it contemplated Petitioner's annual needs for seventeen years. *Id.* Ms. Parisi recommended allocations for projected therapeutic modalities, future medical care, medications, supplies and equipment, home care, and acute care. *Id.* at 6. Petitioner requested $1,401.68 annually for physical therapy sessions and periodic evaluations, $460.44 annually for occupational therapy sessions and periodic evaluations, and $3,250.80 annually for life care plan case management costs. Pet'r's Ex. 35 at 1–2, ECF No. 95-2. Her total requested amount for therapy was $5,112.92 per year until 2040. *Id.* at 2. Ms. Parisi explained that Petitioner's therapy sessions are recommended for gait dysfunction, pain exacerbation, fine motor skill dysfunction, and completing ADLs. *Id.* at 1–2. Petitioner requested $695.36 annually for routine medical care; $568.08 annually for pain medication refills (Gabapentin and Ibuprofen); $39.87 for medical supplies, including a walker and shower modifications; and $30,660.00 through 2032, increasing

7

to $61,320.00 from 2032 to 2040, for home care. *Id.* at 3–6.

Respondent submitted a life care plan for Petitioner developed by Laura E. Fox, MSN, BSN, RN, CLCP. Resp't's Ex. A, ECF No. 113-1. Respondent's submitted plan included costs for therapeutic modalities, future medical care, medications, supplies and equipment, and home care. *Id.* Ms. Fox's plan included offsets for insurance coverage and is also based on Petitioner's past treatment history. *Id.* at 1. Respondent's physical therapy offer covered only copayments for therapy sessions ($240.00 in 2023 then every five years to life) and evaluations ($40.00 in 2023 then every five years to life). *Id.* The plan included a one-time payment of $1,950.48 for case management costs, and Ms. Fox asserted that Petitioner's "need for case management is likely not related to her GBS, but due to her other pre-existing conditions." *Id.* at 2. She reasoned that Petitioner "is able to manage her own care," but may require "case management once . . . to assist with transferring to new insurance plan and follow up." *Id.* Medication costs were also offset by insurance coverage, and Ms. Fox allocated $84.00 annually for Gabapentin and zero dollars for Ibuprofen. *Id.* She explained that the Medicare Advantage insurance plan covers the full cost of Ibuprofen "as it is a Tier 1 drug with $0 copay." *Id.* Petitioner's insurance also subsidized many of Petitioner's requested home care items and Respondent's life care plan consequently offered only a single payment of $170.99 and annual payments of $2.48. *Id.* at 3. Lastly, Ms. Fox noted that "[t]here is no indication or documentation that [Petitioner's] GBS is progressive." *Id.* Therefore, the allotted home care amount does not increase over time and Respondent offered an annual lifetime payment of $15,600.00. *Id.*

## V. Arguments Regarding Damages

### a. Petitioner's Argument

In Petitioner's motion for damages, she requested the maximum pain and suffering award of $250,000.00.[4] Pet'r's Mot. at 26.

Petitioner focused on several factors for consideration, including her continuing problems with ambulation, falling, limitations on activities she enjoyed prior to the vaccine, deficits in her neurological function, difficulty walking, weakness, and gait instability. *Id.* at 27. As to alcohol use and her diagnosis, Petitioner asserted that "[t]here was no report of alcohol use leading to [Petitioner]'s GBS diagnosis."[5] *Id.* Instead, she argued that "[t]he doctors who diagnosed [her] GBS were clearly aware of an alcohol issue but nevertheless diagnosed [her with] GBS." *Id.* at 27 n.8. As such, Petitioner asserted that her continuing problems are not caused by alcohol and instead "are attributable to GBS." *Id.* In support of her demand, Petitioner cited other Program cases where the damages awarded for pain and suffering ranged from $180,000.00 to $250,000.00 to argue that her case meets or exceeds the amounts awarded in those cases. *Id.* at 26–27; *see Dillenbeck v. Sec'y of Health & Hum. Servs.,* No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019), *aff'd in part and remanded*, 147 Fed. Cl. 131 (2020) (awarding $180,857.15

---

[4] Petitioner stated that she "is not separately categorizing past and future pain and suffering, as the cap would be exceeded." Pet'r's Mot. at 26. Petitioner asked the Court for the statutory cap on pain and suffering, however if this is not possible, then she requests for the statutory cap to be exceeded for future pain and suffering. *Id.* at 28.

[5] Petitioner raised this argument because she claims that Respondent referred to her use of alcohol in his Rule 4(c) report. *Id.* at 27 (citing Resp't's Report at 3–4).

8

in pain and suffering); *Dighero v. Sec'y of Health & Hum. Servs.*, No. 15-22V, 2017 WL 5246562 (Fed. Cl. Spec. Mstr. Oct. 19, 2017) (awarding petitioner a proffer of $250,000.00 for pain and suffering).

For instance, Petitioner compared the facts of her case to *Hood v. Sec'y of Health & Hum. Servs.,* No. 16-1042V, 2021 WL 5755324 (Fed. Cl. Spec. Mstr. Oct. 19, 2021) and argued that her "condition is more severe than the petitioner in *Hood.*" Pet'r's Mot. at 30. There, the medical records demonstrated that Mr. Hood suffered a moderate course of GBS after his flu vaccination, which persisted for more than six years. *Id.* at 29 (*Hood,* 2021 WL 5755324, at *10). He could not drive for more than a few miles at a time and was unable return to his job as a butcher. *Id.* The special master awarded Mr. Hood $200,000.00 for past pain and suffering. *Hood,* 2021 WL 5755324, at *11. The special master also awarded him $1,000 per year for future pain and suffering after finding that he "continue[d] to experience muscle weakness and numbness in his lower extremities." *Id.* In the present case, Petitioner asserted that her condition is more severe than Mr. Hood's because she continues to have difficulty ambulating and must "take medication for her primary diagnosis, which is the result of GBS." Pet'r's Mot. at 30.

Instead, Petitioner argued that her case aligns with and exceeds the pain and suffering awards in cases where the petitioner was awarded $190,000.000 to $250,000.00 for pain and suffering*. Id.* For example, Petitioner cited *Creely v. Sec'y of Health & Hum. Servs.,* No. 18-1434V, 2022 WL 1863921 (Fed. Cl. Spec. Mstr. Apr. 27, 2022) to argue that the cases are similar and, therefore, she should be awarded $250,000.00. *Id.* There, Mr. Creely's initial GBS-related hospital stay lasted for seven days; he was treated with IVIG and was subsequently admitted to inpatient care for nineteen days. *Creely,* 2022 WL 1863921, at *12. Mr. Creely continued to live with substantial impairments from GBS, including losing access to the second floor of his home, which resulted in him sleeping in his first-floor living room and bathing in the first-floor half bathroom. *Id.* Mr. Creely also suffered multiple falls, which necessitated emergency medical services on two occasions. *Id.* at *7. Further, Mr. Creely had to sell his pizza shop, which he had operated as a family business for seventeen years, because he could no longer work after his GBS diagnosis. *Id.* at *10–12.

Petitioner then cited two recently decided cases. Pet'r's Mot. at 31. In *Miles v. Sec'y of Health & Hum. Servs.,* the petitioner was awarded $195,500.00 in total for actual pain and suffering. No. 20-146V, 2023 WL 21155, at *9. (Fed. Cl. Spec. Mstr. Jan. 3, 2023). Twelve days after receiving his flu vaccine, Mr. Miles was hospitalized "for fourteen days, which included a lumbar steroid injection, an MRI and EMG, five days of IVIG (one round), three days of IV steroids, and catheterization." *Id.* at *8. At discharge from the hospital, Mr. Miles was limited to a wheelchair and placed in subacute rehabilitation for thirty-one-days. *Id.* Thereafter, Mr. Miles entered inpatient rehabilitation for fifty-six days, and at discharge, he was able to walk short distances with a walker. *Id.* He then completed nineteen outpatient physical therapy sessions, and nine months later, he completed an additional twenty-one physical therapy visits. *Id.* Over nineteen months after Mr. Mile's initial hospitalization, he felt improved and was able to walk with no assistive device, had limited pain, increased endurance, and regained 4/5-5/5 strength in his legs. *Id.* Petitioner here asserted that her "course is dramatically more severe than that experienced by the *Miles* petitioner." Pet'r's Mot. at 32. She compared her case and noted her ten-day initial hospitalization, recurrent falls, and her twenty-nine-month rehabilitation stay. *Id.* Further, she noted that she continues to have trouble walking and taking care of herself, which makes her recovery "dramatically longer and more complicated" than cases that resulted in

9

$175,000.00 to $180,000.00 in pain and suffering awards. *Id.* at 32–33.

In *Miller v. Sec'y of Health & Hum. Servs.,* the petitioner "overall suffered a moderate GBS illness – requiring an eleven-day hospitalization, only two days of inpatient rehabilitation, and 45 days of outpatient rehabilitation" No. 21-1559V, 2023 WL 2474322, at *7 (Fed. Cl. Spec. Mstr. Mar. 13, 2023). However, the petitioner's symptoms had resolved less than five months post-vaccination, and he was able to play tennis three to four times a week one-year post-vaccination. *Id.* The special master found that the petitioner's request for $250,000.00 was "inflated" and awarded $155,000.00. *Id.*

Petitioner requested a life care plan because she "continues to have trouble walking and caring for herself." Pet'r's Mot. at 33. If funded, Petitioner stated it will provide her "assistance and support." *Id.*; *see* Pet'r's Ex. 34, ECF No. 95-1; Pet'r's Ex. 35, ECF No. 95-2.

### b. Respondent's Argument

Respondent included in his response a case-specific analysis with respect to pain and suffering. Resp't's Response at 15–18, ECF No. 114. Respondent characterized Petitioner's course of treatment as "moderate and routine" and acknowledged that she has "some degree of residual gait abnormalities and neuropathic pain." *Id.* at 15. However, her "medical course has been complicated by her longstanding substance abuse issues that are unrelated to GBS." *Id.* Given this, Respondent proposed $165,000.00 for pain and suffering. *Id.* at 16.

Respondent argued that Petitioner's reliance on cases like *Creely* are "factually distinguishable." *Id.* He noted that the petitioner in *Creely* "was an extremely active and healthy 75-year-old man," who "owned his own pizza shop and worked seven days a week." *Id.* (citing *Creely*, 2022 WL 1863921, at *8). Further, the *Creely* petitioner "required treatment in the intensive care unit" during his initial GBS related hospitalization. *Id.* (citing *Creely*, 2022 WL 1863921, at *8). The *Creely* petitioner "never returned to baseline following his GBS diagnosis," which resulted in the loss of abilities, like being unable to bathe himself and relying on adult diapers. *Id.* at 17 (citing *Creely*, 2022 WL 1863921, at *8). Respondent then contrasted *Creely* with Petitioner's circumstances by noting that she was "not working at the time of her GBS diagnosis and was living with her brother," she "did not require intensive care treatment during her initial hospitalization," and she did not have to use adult diapers. *Id.* Additionally, Respondent reiterated that Petitioner "has both a past and current history of substance abuse issues." *Id.*

He asserted that the *Dillenbeck* case "is more instructive to the resolution of this matter," even though the pain and suffering award of $180,857.15 was slightly higher than the proposed amount here. *Id.* (citing 2019 WL 4072069). The *Dillenbeck* petitioner had residual symptoms of GBS years after her vaccination. 2019 WL 4072069, at *4. Her ongoing sequelae included balance issues, decreased grip strength, and lack of sensation in her hands. *Id.* at *3–4. Ms. Dillenbeck's injury prevented her from returning to her previous career as a vet tech because she was no longer able to participate in the physical demands required for her position. *Id.* at *4. When compared to the case at hand, Respondent argued that Petitioner did not have a career that was affected and she "demonstrate[d] poor compliance with medical recommendations." Resp't's Response*,* at 18. However, similar to the *Dillenbeck* petitioner, she does have "some residual symptoms of GBS, including gait impairment and neuropathic pain, requiring the ongoing use of Gabapentin more than six years after her GBS diagnosis." *Id.*

10

As to the life care plan, Respondent recommended "that the Court award Petitioner future care expenses consistent with [Laura E.] Fox's life care plan and assessment." *Id.* (citing Resp't's Ex. A, B, ECF No. 113).[6]

### c. Petitioner's Reply

In her reply, Petitioner argued that "there is little or nothing in the medical record that attributes [her long-lasting GBS effects] to her use of alcohol or substance abuse." Pet'r's Reply at 4, ECF No. 116. Instead, her "substance abuse is just as likely the consequence of her persistent GBS symptoms rather than the cause of her continuing problems." *Id* at 5. She asserts that there is no evidence that her "recovery has been impeded or complicated by her alcohol substance abuse" and therefore it should not serve to reduce her damages. *Id.*

At best, it is "appropriate to attribute [Petitioner's] post-vaccine damages to her vaccine-caused GBS, based on the eggshell plaintiff concept." *Id.* However, even without the eggshell doctrine, she argued that her GBS course was anything but "moderate and routine." *Id.* at 5–6 (citing Resp't's Response at 6). Instead, it would be "inequitable to reduce a damages award," when the RCC staff "wrongly denied [Petitioner's] diagnosis and all but deprived her of appropriate therapy, care, and concern." *Id.* at 6. Petitioner insinuated that "[i]t is more likely that the [RCC staff's] lack of skilled care…impeded [Petitioner's] rehabilitation rather than any alcohol or substance abuse." *Id.*

Petitioner then asserted that the objective medical evidence shows that her "gait abnormality and neuropathic pain are attributable to her GBS." *Id.* Referencing her abnormal EMG testing and absent reflexes as clear indicators of GBS-related impairments, Petitioner argued that her condition was not "moderate and routine." *Id.* at 6–7. She pointed to neurological assessments from 2017, 2020, and 2021, which showed severe gait abnormalities, neuropathic pain, and other GBS-related symptoms. *Id.* at 7–8. Thus, Petitioner argued that there is no basis for reducing damages based on substance abuse because the medical records did not link substance abuse to her GBS. *Id.* at 8. Petitioner requested that the Court base its damages assessment solely on the medical record, disregarding any irrelevant claims about substance abuse. *Id.*

### VI. Legal Standard

Petitioner "bear[s] the burden of proof with respect to each element of compensation requested." *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *see also* § 11(e) ("[P]etitioner shall submit . . . assessments, evaluations, and prognoses and such other records and documents as are reasonably necessary for the determination of the amount of compensation to be paid to, or on behalf of, the person who suffered such injury . . . .").

### a. Life Care Items

---

[6] Respondent filed an updated life care plan by Laura E. Fox on March 18, 2025. Resp't's Ex. D, ECF No. 135.

Compensation awarded pursuant to the Vaccine Act shall also include "[a]ctual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses" that

(i) result from the vaccine-related injury for which the [P]etitioner seeks compensation,
(ii) have been or will be incurred by or on behalf of the person who suffered such injury, and
(iii) (I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or
(II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

"[R]easonable projected unreimbursable expenses" must be shown to be "reasonably necessary." § 15(a)(1)(A)(iii). "Special masters have characterized this phrase as a 'vague instruction' and a standard for which there is 'no precise' definition." *Lerwick ex rel. B.L. v. Sec'y of Health & Hum. Servs.*, No. 06-847V, 2014 WL 3720309, at *5 (Fed. Cl. Spec. Mstr. June 30, 2014); *see also I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *6 (Fed. Cl. Spec. Mstr. May 14, 2013) (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life" (quoting *Scheinfield v. Sec'y of Health & Human Servs.*, No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991))); *Bedell v. Sec'y of Health & Hum. Servs.*, No. 90-765V, 1992 WL 266285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining "reasonably necessary" to mean "more than merely barely adequate, but less than the most optimal imaginable"); *Alonzo v. Sec'y of Health & Hum. Servs.*, No. 18-1157V, 2023 WL 5846682, at *11 (Fed Cl. Spec. Mstr. Aug. 14, 2023).

### b. Pain and Suffering

Compensation awarded pursuant to the Vaccine Act may include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, . . . not to exceed $250,000." § 15(a)(4). There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D,* .2013 WL 2448125, at *9 ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap, criticizing this as constituting "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, he found that pain and suffering should be assessed by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program, applying the statutory cap only thereafter.[7] *Id.* at 595.

## VII. Compensation Factors

Petitioner has acknowledged that her life care plan estimates do not account for insurance coverage and should be adjusted accordingly. Min. Entry, docketed Mar. 3, 2025; *see also* Pet'r's Supp. Br. Petitioner currently has Wellcare Healthcare-dual coverage, a Medicaid Advantage Insurance Plan. Resp't's Ex. D, ECF No. 135. Petitioner will lose this coverage when she receives compensation from the Program. Petitioner will then be eligible for a Wellcare Simple Open Preferred Provider Organization with no premiums and no annual deductible. *Id.* Her coverage is included in all life care awards.

### a. Medicaid Lien

The parties respectfully requested judgment in this case include the agreed upon amount of $9,254.65 to satisfy Petitioner's outstanding Medicaid lien. Joint Status Report, ECF No. 125. The request specified that the check issued by Respondent should be payable to the New York State Department of Health. *Id.* Upon receipt, Petitioner's attorney would transmit the check to the New York State Department of Health as instructed in Pet'r's Ex. 44. *Id.*; *see* Pet'r's Ex. 44, ECF No. 121; Pet'r's Ex. 48, ECF No. 133.

---

[7] Respondent made a lengthy argument regarding damages evaluation based on *Graves* and ultimately argued that the decision is not binding in this case. Although *Graves* is not controlling the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards. *See Creely,* 2022 WL 1863921, at *11 ("I have also followed Judge Merrow's decision in *Graves* and will do so in this case as I find its reasoning persuasive").

13

### b. Life Care Plan

#### i. Life Care Plane Management

Petitioner requested $3,250.80 annually for life care plan case management costs. Pet'r's Ex. 34 at 1–2. She explained that this amount covers twenty sessions per year at $162.54, for "coordination of care in the life care plan." *Id.* at 2. I agree that this is necessary, but not on an annual basis. Respondent's contention that Petitioner should be awarded a one-time, initial amount to set up the coordination of her care is reasonable. I will award Petitioner a one-time amount for twelve case management sessions within the first year of the implementation of her life care plan for treatment coordination.

#### ii. Therapies

The parties agree that Petitioner is entitled to physical therapy sessions and periodic evaluations, although they disagree on frequency. *See* Pet'r's Ex. 35 at 1; Resp't's Ex. D at 1–2. Based on Petitioner's request and past history, I find that three physical therapy sessions per year is reasonable and feasible for Petitioner, along with evaluations every four years. I will award Petitioner an amount to cover her total physical therapy costs, consisting of her copays plus evaluations. Petitioner also requested an award for occupational therapy in her life care plan, but Petitioner's records do not show she has ever attended occupational therapy, nor do her medical records contain a referral. This cost will not be awarded as it is not reasonably necessary.

#### iii. Future Medical Care

The parties agree that Petitioner is entitled to two medical visits for specialist care per year. *See* Pet'r's Ex. 35 at 3; Resp't's Ex. D at 2. Petitioner is entitled to amount to cover that cost for future medical care.

#### iv. Medical Supplies, Equipment, and Medication

Petitioner requested an annual award for replacement medical supplies every five to ten years. Pet'r's Ex. 35 at 5. I find that request mostly reasonable and will award Petitioner for a replacement walker every five years and replacement transfer bench every eight years. Petitioner will also receive a one-time award for a hand-held shower and for shower grab bars, including installation, both at current costs. Petitioner would not be responsible for medication copay under her Medicare Advantage Plan. Therefore, these costs will not be awarded.

#### v. Home Care

Respondent does not dispute that costs for home care should be awarded. However, the parties dispute the number of hours per week and whether an elder care increase should be awarded. Respondent asserted that 12 hours per week is reasonable, but there is no explanation of how Respondent arrived at his recommendation that averages approximately one hour and forty-two minutes a day. Resp't's Ex. D at 4. Likewise, Petitioner's request does not contain an accounting for the daily hours requested. *See* Pet'r's Ex. 35 at 6. I find that two hours a day, seven days a week, for home care is reasonable to assist Petitioner with her stated needs to complete "household chores, errands, and with aging personal care." *Id.* Respondent correctly asserted that

"[t]here is no indication or documentation that [Petitioner's] GBS is progressive." Resp't's Ex. D at 4. Therefore, I do not find it necessary to increase Petitioner's allotted home care after any period of years.

### c. Pain and Suffering

#### i. Awareness of Suffering

In this case, neither party has raised, and the record does not indicate that Petitioner's awareness of suffering is in dispute. Based on the evidence and circumstances of this case, I find that Petitioner had full awareness of her suffering.

#### ii. Severity and Duration of Pain and Suffering

Petitioner asserted that her injury is more severe than other Program cases, wherein the petitioners received awards approaching $250,000.00. A review of the medical records in this case reveals that 17 days post-vaccination, Petitioner was hospitalized for ten days and underwent IVIG, a lumbar puncture, and CT imaging. Pet'r's Ex. 7. She was diagnosed with GBS, and doctors noted that she would require rehabilitation. *Id.* at 117. Petitioner was then transferred to a residential rehabilitation facility for 43 days before suffering a fall that resulted in a second hospitalization. Pet'r's Ex. 4 at 2. She remained at the hospital for eight days before being transferred to a long-term residential care facility for over 29 months. *See* Pet'r's Ex. 2; Pet'r's Ex. 4. During this time, a March 11, 2017, psychiatric consultation noted her history of GBS with neuropathy, possibly linked to alcoholism. Pet'r's Ex. 2 at 292. In April 2017, she was disciplined for alcohol use at the facility. *Id.* at 306. By June 2017, five months after Petitioner's GBS diagnosis, she still needed a walker and took Percocet for pain. Pet'r's Ex. 9 at 216, 313. In August 2018, a neurologist diagnosed her with peripheral neuropathy and advised her to stop alcohol abuse, start physical therapy, and taper off Percocet in favor of Tylenol. Pet'r's Ex. 13 at 2–3. An October 23, 2018, RCC progress note mentioned a second opinion from another neurologist, who believed Petitioner displayed "drug seeking behavior." Pet'r's Ex. 19 at 946. On August 11, 2019, Petitioner signed herself out of RCC against medical advice. Pet'r's Ex. 21 at 87. She was provided with her walker and medication. *Id.* Twelve days later, Petitioner presented to the Good Samaritan ER for medication prescriptions and complained about nerve pain in her hands, feet, and back. Pet'r's Ex. 25 at 277–88. Over one year later, during a neurology visit, Petitioner was using a walker, and physical therapy was ordered by Dr. Loftus. Pet'r's Ex. 24 at 11. Petitioner participated in three home physical therapy sessions before declining further therapy because she claimed that she was "doing well." Pet'r's Ex. 28 at 32. Petitioner was noted to have "ongoing neuropathic pain" during a 2021 neurology visit. Pet'r's Ex. 29 at 10. In 2020 and 2023, Petitioner endured injuries from two separate falls as a result of leg weakness. *See* Pet'r's Ex. 25; Pet'r's Ex. 40.

Petitioner stressed that she still suffers from the lasting effects of her GBS diagnosis. She compared her case to the petitioner in *Creely* and argued that her past and continuing experience with GBS is worse than those of the petitioners in *Hood, Miles, and Miller*. Pet'r's Mot. at 29–33. Despite Petitioner's contentions, her case is distinguishable from *Creely*. In *Creely*, the petitioner was awarded $250,000.00 for past pain and suffering. 2022 WL 1863921, at *13. The case record spanned over five years post-onset, and throughout, petitioner was "compliant with physical and occupational therapy appointments, neurology appointments, pain management

appointments, and primary care appointments." *Id*. at *10. Mr. Creely's GBS made him unable to ascend the stairs on his own, which confined him to his first floor living room. *Id.* at *12. Additionally, he could not bathe himself and had to use adult diapers. *Id.* At the time of Petitioner's GBS onset in the present case, she was living in her brother's basement. She had to move out after GBS rendered her likewise unable to traverse the basement stairs. While it is true that both petitioners were unable to ambulate for long distances or use the stairs, Petitioner in the present case is not subject to the additional daily indignities of adult diapers and assisted baths like the petitioner in *Creely*. Also, like the present case, the petitioner in *Creely* experienced multiple falls as a result of his GBS, two of which required emergency medical services. *Id*. However, in *Creely,* the petitioner did not suffer from any other condition that may have exacerbated his tendency to fall and/or increased the likelihood of severe injury. It is unclear in the present case, how much Petitioner's documented alcohol use may have impacted her instability. Nonetheless, alcoholism is a known cause of serious falls and mobility issues.

Although the duration of Petitioner's injury is similar to that in *Creely*, Petitioner here had difficulty complying with her treatment plan. Petitioner's rehabilitation was complicated due to her alcohol dependence, and she was regarded as a "problem resident." Pet'r's Ex. 2 at 313. While at RCC, she was disciplined for having alcohol in the facility and she refused to follow the rules. Ultimately, she signed herself out of RCC, against medical advice, on August 11, 2019. Dr. Loftus prescribed Petitioner physical therapy, but she completed only three sessions and quit because she was "doing well." Pet'r's Ex. 28 at 32. Petitioner never returned to physical therapy, even though her medical records show that she continues to struggle with falls. Petitioner argued that an aggravating factor here was her "unusually protracted rehabilitation and continuing impairments." Pet'r's Mot. at 31. However, the medical records detail how her treatment was complicated by her non-compliance and alcohol use. Petitioner's case does share some similarities with *Creely*, but there are some significant distinctions. I do not find the two cases to be analogous.

Likewise, Petitioner compared her case to the *Hood* petitioner, however she claimed that her condition is more severe because she continues to have difficulty ambulating and must take medication for her GBS. Pet'r's Mot. at 30. However, the *Hood* petitioner attended physical therapy two to three times a week for more than seven months and, in total, completed 86 outpatient physical therapy sessions. 2021 WL 5755324, at *8. Here, Petitioner was required to complete physical therapy to address her balance issues and her "severe impairment gait." Pet'r's Ex. 29 at 17. However, she discontinued treatment after just three sessions, highlighting a stark contrast with the *Hood* petitioner in terms of adherence to treatment plans and efforts to mitigate the lasting symptoms of GBS.

In addition to *Creely* and *Hood,* Petitioner discussed two other cases wherein there were extended hospitalization and rehabilitation periods, but ultimately the petitioners' experienced significant recoveries. *See Miles,* 2023 WL 21155; *Miller*, 2023 WL 2474322. Petitioner's treatment course is similar to these cases in length and intensity of treatment. Petitioner argued that her pain and suffering are more severe than those cases because of her continued symptoms and lasting effects. However, her recovery was substantially compromised by Petitioner's withdrawal from therapy and refusal to cooperate with staff and follow rules while at the rehabilitation facility. Petitioner's actions against medical advice contributed to the "dramatically longer and more complicated" recovery that she described. Pet'r's Mot. at 32. Petitioner also argued that her injury is more severe than the *Miller* and *Miles* petitioners. The *Miles* petitioner

16

had "very much improved" nineteen months after his initial GBS episode and was able to walk without an assistive device, had limited to no pain, increased endurance, and regained 4/5-5/5 strength in his legs. 2023 WL 21155, at *8. In *Miller*, the petitioner's symptoms were described as mild, and the Chief Special Master found that his GBS was moderate, with most of his symptoms resolving "less than five months post-vaccination." 2023 WL 2474322, at *10. Based on these facts, I agree that Petitioner's treatment course and continued gait instability depict a more severe injury.

Respondent proposed $165,000.00 for Petitioner's pain and suffering. Within this proposal, he asserted that Petitioner's case is analogous to the *Dillenbeck* petitioner because both reported residual symptoms of GBS years after their vaccination. Resp't's Response at 17–18. Respondent argued that Petitioner, unlike the *Dillenbeck* petitioner, did not endure pain and suffering due to the loss of a job or business. *Id.* at 18. This should not eclipse the fact that her GBS diagnosis impaired her ability to perform previously enjoyed hobbies and some activities of daily living. Although Petitioner's professional career was not altered, she lost her ability to reside at her brother's home, carry heavy groceries, and go dancing on the weekends. Nevertheless, Petitioner's assertion that her alcohol abuse is not relevant to a damages calculation ignores the reality that her treatment was less effective due to her failure to follow medical advice to continue treatment and stop drinking. The effects of alcohol on balance and mobility are well documented, and it is unclear what/if any role prohibitions on alcohol use may have had on Petitioner's decisions to continue her treatment plan. While she is correct that she should not be denied compensation for struggling with addiction, her vaccination is not the but-for cause of the prolonged complications and symptoms from her continued alcohol consumption. The difficulty of what comes along with a diagnosis of GBS should be noted. *Alonzo* 2023 WL 5846682, at *12 ("Program decisions have generally recognized that GBS is a particularly frightening injury, given its nature and progression.").

In determining an award in this case, I have not relied on a single decision or case. Rather, I reviewed this Petitioner's history and circumstances, giving due consideration to the facts and damages in other cases cited by the parties and other relevant cases. Petitioner's case is similar to cases where the injured parties underwent inpatient rehabilitation or physical therapy but continued to suffer some lasting effects. However, her history with alcohol during her recovery cannot be overlooked. After a review of all of the evidence in this case and other cases presented as comparable by the parties, I find that $190,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering and emotional distress.

Regarding future pain and suffering, Petitioner has not shown that the residual symptoms she continues to suffer will have a compound effect on her in the future. Nor is there evidence in this record of a truly permanent injury disability (beyond the usual lingering sequelae, which is accounted for in the actual pain and suffering award). Thus, I do not find that an award for future pain and suffering is warranted in this case.

## VIII. Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, I award Petitioner the following compensation:

A. A lump sum payment of $190,000.00 for actual pain and suffering.

B. A payment of $9,254.65 to satisfy Petitioner's outstanding Medicaid lien. The check should be payable to the New York State Department of Health.

C. An amount sufficient to purchase an annuity contract, that will provide payments for the life care items outlined in this Decision, paid to the life insurance company from which the annuity will be purchased.

Within forty-five (45) days, or by **Monday, June 2, 2025**, Respondent shall file a status report which includes a complete and final Life Care Plan which reflects the above findings and a Damages Order will issue thereafter.

**IT IS SO ORDERED.**

<u>s/Herbrina D. S. Young</u>
Herbrina D. S. Young
Special Master